†L. S. & M. S. Ry. Co. v. James H. Winslow.

1. EVIDENCE THAT PLAINTIFF CALLED ATTENTION OF COMPANY TO DANGEROUS SWITCH IS COMPETENT.

In an action for injuries resulting from an unblocked railway switch, it is competent for the plaintiff, who admits having knowledge at a certain time prior to the accident of the unblocked or dangerous condition of the switch, to show that he called the attention of the company's officers to the switch in question and at the time of the accident he had reason to believe and did believe that the said switch had been blocked.

2. HAVING NOTIFIED THE COMPANY, PLAINTIFF MIGHT REASONABLY SUPPOSE THAT THE SWITCH HAD BEEN BLOCKED.

In such a case, the plaintiff might properly be held not to have assumed the risks and dangers incident to permitting the switch to remain unblocked, and would be error for the court to charge that 1: "If the jury find from the evidence that the plaintiff knew, or by the exercise of reasonable care and caution on his part, in the performance of his service, he should have known of the perils of the switch and thereafter remained in the service of the company, he took upon himself and assumed the risks and perils of such service."

3. NOTICE TO ASSISTANT YARD-MASTER IS NOTICE TO COMPANY.

Although such person is not the one to actually put in the block, and may not have charge of the tracks or their maintenance and repair, yet having charge of all the operations of the yard which might subject plaintiff to danger, it was his duty, having information of the dangerous condition of the switch, and having made a promise to repair it, to see that it was done before he ordered the plaintiff there, and in this respect he stood in the place of the master.

4. THE PRACTICABILITY OF BLOCKING A RAILWAY SWITCH IS A QUESTION FOR THE JURY.

The question as to whether it is the duty of a railroad company to block a certain switch is one for the jury.

5. MEASURE OF DAMAGES.

A verdict of $7,000 for injuries to plaintiff, by having his foot crushed, by which he was permanently crippled, will not be disturbed on the ground of passion or prejudice. (Plaintiff's age not given.)

ERROR to Lucas County Common Pleas.

BENTLEY, J.

James H. Winslow recovered a judgment in the court of common pleas against the railway company for seven thousand dollars for an injury received while he was in the employ of the company, caused by getting his foot caught in a switch at a point named, which switch was unblocked, and being held there so that certain cars ran over his foot causing him to be permanently lame and crippled.

As we understand it the question as to whether the verdict was sustained by sufficient evidence, except as to its amount is not presented for our consideration. It is a case, however, where a sharp controversy is presented between the views of counsel on both sides as to the duty of the railway company to cause the switch in question to be blocked at the place where the injury occurred. It is said that it appears that Mr. Winslow's foot was caught at substantially the same place where the foot of one (Calkins) was caught and held until he was killed by the cars running over him, or injured so that he died, and the action regarding which injury was decided by this court in January, 1892, and the judgment against the company in that case was affirmed. A large part of this record is taken up with

† This case, in the Supreme Court, was settled and dismissed at the cost of plaintiff in error, May 14, 1895; 2 Legal News, 495.

testimony bearing upon the question of the duty of the railway company to block the switch at that point where the movable rail comes up to the fixed rail as a part of the switch in what is called a split switch. The movable rail, when the switch is closed, is placed and held tightly to the fixed rail, and when the switch is opened, the movable rail is removed by the action of the switch machinery from three and one-half to four inches away from the fixed rail.

The railroad company in this case has strenuously urged that, as to a space of this kind, the statute requiring the blocking of guard rails, switches or frogs does not and should not apply; that it is impracticable to block a space of this kind, and thus render it safer for the employees about the switch, having duties to perform there; and, furthermore, that even if the block might possibly be thought by some to render it safer for a switchman employed there, there would be far greater dangers presented by reason of this blocking to the trains which should pass over the switch, there being great danger of derailment by reason of the block, and foreign substances getting between the block and the rails, so that when the switch is closed, or when the standard should indicate that it was closed, the end of the movable rail would not be held tightly against the fixed rail, so that the flanges of the car wheels coming along there, instead of being deflected from the fixed rail on to the movable rail, would pass between the opening thus left—between the point of the movable rail and the fixed rail, and disastrous consequences would be likely to result.

As we understand it, in this case the question as to whether or not evidence was sufficient to prove that the company is in duty bound to block at this point, is not presented; but if we are in error as to that, we might say that there is testimony upon both sides of that question in this record here, the plaintiff producing some testimony that this place may be blocked safely and properly with due regard to the safety of trains, etc., and that in some cases such places have in fact been blocked and thus used by this company. On the other hand, the company, by quite a number of apparently very intelligent and experienced witnesses, has given evidence tending to show that it is impracticable and dangerous, and that it should not be held to be the duty of the company to block at this point. Of course, with that condition of testimony, it is our duty not to interfere with the finding of the jury on that controverted question of fact.

It is claimed, however, by counsel for the company that the action of the court during the trial was erroneous, first, in admitting certain testimony that was incompetent and immaterial and prejudicial to the railroad company, and secondly, that the court erred in refusing certain requests preferred to it by the counsel for the company at the close of the evidence. The testimony which is alluded to is found on pages 68 and 69 of the record.

Before calling special attention to the character of that testimony, I will briefly notice the condition of the pleadings in respect to such matters. In the amended petition of the plaintiff, he departs from the allegation made in the original petition. In his original petition, he had alleged that he had no knowledge that this switch at the place in question was unblocked; had no knowledge of the danger to which its unblocked condition exposed him. By the amendment afterwards filed, he says that at some time prior to the accident he did have knowledge that this particular place was unblocked. The allegation in that respect being short, I will read it:

"Plaintiff says that at the time of the accident he was ignorant of the fact that the frog was unblocked or unfilled, although some time prior to said occurrence he had been cognizant of such fact and had informed the company and the officers thereof who were his superiors and had charge of said yard, of such condition, and the promise had been made by his superior officers and representatives of the company in charge of the yard to him, that the frog would be filled and blocked, and the plaintiff continued in the employ of the company thereafter on such promise."

This is denied by the railway company in its answer. It will be seen that by this amendment he admits that at some time prior to the accident he had

knowledge of this condition, but that at the time of the accident, he **had no** knowledge that the switch had remained unblocked and unfilled; that is, between the time of his finding, or knowing that the place was unblocked and unfilled **and** the time when he was injured, he had had the promise of the company's officers that it should be fixed and filled. He had testified himself prior to the giving of the testimony on pages 68 and 69, by the other witnesses, that he had called the assistant-general yardmaster's attention to this unblocked condition of the switch, and that that officer had promised him that he would have it fixed. He says, himself, also, that a short time before the accident, he had seen some of the company's men who were engaged in blocking frogs and switches, at work about this place here in question, and that he supposed at the time of the accident that it had been in fact fixed, that is, blocked or filled.

This accident occurred to him on August 25, 1891, and the testimony objected to on pages 68 and 69 was the testimony of John T. Atkinson, a railroad employee. Mr. Atkinson says that at that time there were men who had come with blocks, and were engaged generally in putting in blocks along the company's tracks; that at that time they were working somewhere in the vicinity of the switch in question, that he called the attention of the plaintiff below to that, and made the remark that "they were doing a d—d good job up there," or some such expression; and that the testimony which the court allowed over the objection of the counsel for the railway company. Mr. Atkinson was not certain as to just when this occurred, but he gives it as his impression and belief that it was either in the latter part of July or the first of August, 1891. He says that he thinks he left the yard on August 20, and it must have been prior to that time. His testimony is tolerably direct that it was either the latter part of July or the first of August; whether he meant the first day of August or the first part of August is not entirely clear. The court admitted that upon this idea, it was proper and competent for the plaintiff to say notwithstanding he had prior knowledge that this place was unblocked, that such circumstances had occurred as led him to believe that it had been fixed, or perhaps that the promise of the assistant yardmaster had been complied with and the court held that that would be competent testimony as bearing upon the question of the state of mind of the plaintiff at and just before the time that the accident occurred; that is, that his belief in the matter founded upon such circumstances as had come to his attention, might bear upon the question of his own care, or want of care in doing as he did on the occasion of the injury.

Now, in general, we think that that testimony would have been proper if it had borne upon the real question. As it stands, it seems as if it would have very little practical effect, because the plaintiff testifies that he had made complaint of this unblocked condition of the switch several times to this yardmaster; that some days or weeks intervened between the occasion when he called the yardmaster's attention to it, on which occasion the yardmaster or the assistant yardmaster had promised that the matter should be remedied. His testimony indicates that the last of these conversations was comparatively a short time before the accident to him, and we should judge from the testimony that such a conversation probably occurred between the last of July or the first of August, and the accident. So that if it were a mere matter of weighing the testimony, we should think that it would be fairly inferred from the record that this conversation with Mr. Atkinson occurred prior to the time when he had last called the assistant yardmaster's attention to the defect; so that, if that were so, the testimony would have no real bearing upon the point actually in controversy. But the court admitted this and as the time of this occurrence was not definitely fixed, we think it would not be allowable for a court of error to say that the introduction of this testimony was absolutely erroneous on account of the time. Peradventure from all that may have been said by Atkinson and the other witnesses, this conversation may have been later than he was inclined to think it was, he not being definite upon it; and also there was room for a divergence of idea as to just when the

last conversation with the assistant yardmaster occurred; so in view of these circumstances, we think it cannot be said that the introduction of this testimony was error prejudicial to the plaintiff in error.

The other questions presented, as I say, relate to the instruction of the court to the jury. On page 168, it is shown that a request for an instruction to the jury was presented by the counsel for the defendant below in these words:

Second. "If the jury find from the evidence in this case that the plaintiff knew, or, by the exercise of reasonable care and caution on his part, in the performance of his service, he should have known of the perils of the switch, and thereafter remained in the service of the company, he took upon himself and assumed the risks and perils of such service."

If the court had given that request to the jury, it will readily be seen that all the contention of the plaintiff regarding any rights that he had, based upon this promise to remedy this defect, would have been of no avail. It leaves out of consideration anything that might be claimed for him in this regard, and if given by the court, would place the court in the position of holding that all the testimony bearing upon this whole queston of the promise of the assistant yardmaster had no effect whatever in favor of the plaintiff. We think the court might have refused this request on that account; and then further, this request says that "if the find jury from the evidence in this case that the plaintiff knew, or by the exercise of reasonable care and caution on his part in the performance of his service, he should have known of the perils of a slip switch, and thereafter remained in the service of the company, he took upon himself these risks, etc."

Now, the plaintiff may have known, of course, he being chargeable with knowledge of the general perils of a slip switch, that there might be some dangers connected with it, and yet, as to this particular one—as to the particular danger by which he claims to have been injured in this case, he might not be properly held to have assumed the risks. For instance, if it was a fact that this switch could have been blocked and ought to have been blocked by the company, and although he knew at one time it was not blocked and the assistant yardmaster promised that it should be blocked, and he, at any rate, supposing, and having reason to suppose, that at the time in question it had been blocked, this instruction would have been erroneous, as applied to this particular case.

The 13th and 14th requests by counsel for the railway company were also refused. The 13th reads as follows:

"The plaintiff complaining to the assistant yardmaster of the unblocked condition of the movable rail of the switch in question, and his, the yard-master's, promise to have the same blocked, will not bind the company therefor, unless it appears that the assistant yardmaster had the direction, control or charge of such track or tracks, and of their maintenance and repair."

The 14th request is as follows:

"The plaintiff complaining to the assistant yardmaster of the unblocked condition of the movable rail of the switch in question, and his, the yard-master's, promise to have the same blocked, will not bind the company therefor, unless it appears that the assistant yardmaster had the direction, control and charge of such track or tracks, or of their maintenance and repair."

It will be seen that the only difference between the 13th and 14th requests is made by the use of the connectives "and" and "or" differently in one from that in the other. But the proposition presented by the company in these requests is this: That even if the plaintiff had complained to the assistant general yardmaster of this condition, and although he may have been the superior of the plaintiff as to matters of his duty to the yard; and although the assistant general yardmaster may have had general control of the cars and the switching of cars, and all the direction of the men employed at that work, yet a complaint to him and a promise by him to block this switch would in no wise bind the company or operate to the advantage of the plaintiff in an action of this kind, unless the assistant yardmaster also had the care and control of the tracks themselves, and the

**authority** to keep them in repair. That is, he must either have both of these duties to perform—that is, he must have the control or charge of such track or tracks, and also of their maintenance and repair, or at least, it is claimed, he must have had control and charge of such track or tracks, or of their maintenance and repair. That unless he did, a complaint to him and a promise by him would be of no moment and he would not thereby be representing the company as to the particular matter

The case in 45 Minn., 338, is presented as sustaining the views of the railway company in this regard, and, *Mfg. Co.* v. *Morrissey*, 40 O. S., 148, is also another authority. The syllabus of the Minn. case is as follows:

"A servant whose duties require him to work in a place known by him to be unsafe so that he would otherwise be taken to have assumed a risk, cannot relieve himself from such assumption of risk by showing a promise to make the place safe by one other than his master, unless that other person had authority to determine what should be done for the safety of those employed in the place and the duty to have it done.

In that case the defendant was a single individual, having a mill about which the plaintiff in that case was employed; and there was a dangerous condition about the place; when certain parts or appliances were not in position, it left a hole in the floor, in a dark sort of place where a party passing along would be liable to fall in and be injured, and that some person in the employ of the mill-owner, about the mill in adjusting matters on a particular occasion had left this place in the floor uncovered. The plaintiff in the case started to go through that passage, and, it being dark, he had a lantern. His lantern went out before he had reached this dangerous place, but notwithstanding that, he continued on and fell into this place and was injured. It seems that he had been employed about the mill for quite a long time and was perfectly familiar with this situation and the liability to this danger. There was a party employed about the mill making different repairs that he was ordered to make, and the plaintiff, prior to the accident, had called his attention to this and suggested that something by way of a guard ought to be placed over this hole so that if its covering should be removed, a person would not fall into it and be injured, and this party had indicated that he would attend to the matter, or do something of the kind. But the difference between that case and this as to facts and rules applicable to it is this, in part, at least: the millwright or repairer, in the Minnesota case, who had suggested that he would fix that place, was not in any sense, or in any way or manner the superior of the plaintiff in that case. Neither had he any duty to perform as to making such repairs of his own motion; but he was simply to make such repairs as those in charge called his attention to from time to time and ordered him to do, so that as to the plaintiff he in no wise stood in the place of the common master and did not represent the master. Now, in that case, with those facts presented, the court held that notice to such a man was not notice to the master and did not excuse the person who had full notice and knowledge of the danger, from looking out for his own safety.

We think another rule applies to the case in question here, that is, that although the assistant yardmaster may not have had the duty to repair the tracks, or the general duty to supervise their construction or repair, yet in the use of them, he was the immediate superior of the plaintiff in this case. He says that in whatever he ordered the plaintiff to do in the line of switching and moving cars, etc., the plaintiff was bound to obey him, and that on the particular occasion in question, the plaintiff was obeying one of his direct orders.

Now, being the superior of the plaintiff, he had at least, control of the movements of the plaintiff and in case his attention had been called to the dangerous position, and he directly sent the plaintiff, there to work, he might have been guilty of negligence himself, and thus charged the company with the results of his negligence. It was competent for him, in view of the dangerous situation which he knew, to have refrained from ordering the plaintiff to perform work in

Railway Co. v. Winslow.

the vicinity of this danger until this repair had been made, no matter by whom; and in case the facts are as the plaintiff claims, not only should he have refrained from ordering the plaintiff there, but he should, in the general direction of matters about the yard over which he had full control, have so ordered things that in the course of the business which the plaintiff was called upon to perform, he would not necessarily and naturally be brought to do this.

We are cleary of the opinion that, although this man, himself, would not have been the man to actually put in the block there, yet, having charge of all the operations of the yard which might subject the plaintiff to danger, it was his duty, having this information, and having made this promise, to see that it was done before he ordered the plaintiff there, and in this respect he stood in the place of the master.

There are difficulties suggested that would arise in case the views of the defendant's counsel should prevail here, that is to say, the plaintiff would be subject to the duty of either seeing some general track master, or some section boss, or some person who had special charge of these matters, and whose duty it was to make repairs and changes; and the plaintiff being under the direct control of the assistant yardmaster, it might be exceedingly questionable whether there would ever come a time that the plaintiff would be justified in leaving his work and seeking other persons who were perhaps not in that vicinity, and who might not be accessible to him anyway. But, however that might be, we think that the rules of law applicable to the case are, as we have stated, that it is not a question as put in these requests—whether the assistant yardmaster was the person who should actually do this work, or whose duty it was to see that it was done; but that, being the immediate superior of the plaintiff, in his operations around that yard, and having general charge there, and having made this promise, it was sufficient to excuse the plaintiff, if afterwards, in the exercise of proper caution and care himself, under all the circumstances, he remained in the general employ of the company at that place. That is, that under such circumstances, it did not necessarily become the duty of the plaintiff to quit the company's service; that he might still remain without actually taking upon himself the risks of this danger. There would still remain, however, the duty upon the plaintiff to exercise reasonable care and caution, under all the circumstances of the case, and although he did not take the general risks which this general danger presented, of course, he could not himself be actually negligent upon any particular occasion and thus suffer injury, and still hold the company liable. But if these requests had been given, however cautious the plaintiff may have been upon the particular occasion in question, although he might have used extraordinary care, and caution, he would have been held to have taken the risks of remaining in the employment of the company and of any injury resulting from this defect.

The plaintiff on this particular occasion, it seems by the proof, did not voluntarily walk along at this dangerous place, and without thinking of the danger, put his foot in a narrow place and thus get caught. But he was doing his work some distance from there—he thinks about twelve feet—before he gave the signal to the engineer to slack back that he might pull the pin in uncoupling the cars, a duty that he might have performed within a very short distance, probably a foot or two, without any considerable motion of one of the cars; but, contrary to his expectation, the engineer backed suddenly and violently, and the plaintiff, having hold of the car with one hand, was thus thrown in the direction of the movement of the train, and before he could right himself up, he was over this particular dangerous place and his foot went into the frog or switch and was caught.

There might still be left the question to the jury, whether the plaintiff, in view of all that he knew and had heard, was at that particular time in the exercise of due care and caution in doing that thing; but that is not here presented. So,

upon the questions that are presented and argued, finding against the contention of counsel for the plaintiff in error, the judgment will be affirmed.

The verdict was quite a large one, it is true, for the injuries sustained. It is a larger verdict than, in times past, we think would have been given ordinarily for such an injury. But it is not larger than quite a number of verdicts in substantially similar cases, and which we have been called upon to pass upon, and which we have affirmed. We think it can hardly be said that, in view of the serious and permanent injury, the jury in awarding seven thousand dollars, acted under the influence of passion or prejudice, or that they acted under such an utter disregard of the testimony as to the extent of the injury and all, as would warrant us in saying that they acted under any misapprehension; so that, as I said, the judgment will be affirmed.

*E. D. Potter, Jr.*, for plaintiff in error.
*Hamilton & Ford*, for defendant in error.

---

1 Dec.
15⅗

# CHATTEL MORTGAGE.

[ Wood Circuit Court, October 29, 1894.]

Bentley, Haynes and Scribner, JJ.